IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAGIDIPATI ENTERPRISES, INC.,  )
                               )
            Plaintiff,         )
                               )
    v.                         )    1:10CV742
                               )
LABORATORY CORPORATION OF AMERICA )
HOLDINGS,                      )
                               )
            Defendant.         )

### MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

The above-captioned case comes before the undersigned United States Magistrate Judge for a recommended ruling on Plaintiff's Motion for Summary Judgment (Docket Entry 31), pursuant to this Court's Amended Standing Order 30 and 28 U.S.C. § 636(b)(1)(B) (see Docket Entries dated Sept. 29, 2010, and Nov. 11, 2011), as well as for disposition of Defendant's Motion for Leave to File a Surreply to Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment (Docket Entry 55), pursuant to 28 U.S.C. § 636(b)(1)(A) (see Docket Entry dated Nov. 28, 2011). For the reasons that follow, Defendant's Motion for Leave to File Surreply to Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment (Docket Entry 55) will be granted and a recommendation will be made that the Court grant Plaintiff's Motion for Summary Judgment (Docket Entry 31).

### BACKGROUND

This case arises from a Complaint, which identifies Plaintiff as "a Florida corporation, formerly doing business in Ocala, Florida, as Suncoast Labs" (Docket Entry 1, ¶ 1) and Defendant as

"a Delaware corporation having its principal place of business in Alamance County, North Carolina" (id., ¶ 2). Plaintiff and Defendant "are parties to an Asset Purchase Agreement [("APA"), as to which, by its terms,] . . . North Carolina law governs." (Id., ¶ 5; see also Docket Entry 5, ¶ 5.)

According to the Complaint, under the APA, "in the event certain conditions are met, Plaintiff is entitled to receive from Defendant, and Defendant is obligated to pay to Plaintiff, an [E]arnout [P]ayment . . . calculated based on revenues earned by Defendant during the applicable [E]arnout [P]eriod from Plaintiff's former customers . . . ." (Docket Entry 1, ¶¶ 6-7.) The Complaint further alleges that "[t]he necessary conditions for Plaintiff to receive an [E]arnout [P]ayment have been met, and Plaintiff is entitled to receive from Defendant, and Defendant is obligated to pay Plaintiff, the [E]arnout [P]ayment . . . [but that] Defendant has failed and refused to pay the [E]arnout [P]ayment." (Id., ¶¶ 17-18.) Based on these allegations, the Complaint asserts that "Defendant's failure to pay Plaintiff the amount due and owing Plaintiff under the [APA] constitutes a breach of [the APA] which has caused Plaintiff damages . . . ." (Id., ¶ 29.)

In its Answer, Defendant admitted that it "has not paid the [E]arnout [P]ayment but den[ied] . . . that [it] owes any [E]arnout [P]ayment to Plaintiff." (Docket Entry 5, ¶ 18.) Additionally, Defendant's Answer asserts an affirmative defense that "Plaintiff's claims are barred by the doctrine of mutual mistake." (Id., ¶ 32.)

-2-

With leave of Court (Docket Entry 22), Plaintiff thereafter filed a Supplemental Complaint alleging a second Earnout Period had passed without Defendant "pay[ing] Plaintiff the [Earnout] [A]mount due and owing under the [APA] . . . [resulting in] a breach of [the APA] which has caused Plaintiff damages . . . ."  (Docket Entry 24, ¶ 35.)  Defendant's Answer to Supplemental Complaint incorporates the affirmative defenses asserted in the Answer and denies any breach of the APA.  (Docket Entry 25, ¶¶ 30, 35.)

After the close of discovery (see Docket Entry 23), Plaintiff filed its instant Motion for Summary Judgment (Docket Entry 31).  Defendant responded in opposition (Docket Entry 51)[1] and Plaintiff replied (Docket Entry 53).  Defendant then filed its instant Motion for Leave to File a Surreply to Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment (Docket Entry 55), which Plaintiff has opposed (see Docket Entry 57).

## DISCUSSION

Plaintiff has moved for summary judgment.  (See Docket Entry 31.)  In opposition, Defendant has cited declarations from Robert Nelson and Greg Klenke that addressed the Earnout Payment.  (See, e.g., Docket Entry 51 at 8, 10, 12-13, 15.)  In its Reply, Plaintiff has argued that the Court should disregard those declarations because Defendant failed to properly disclose Nelson

---

[1] The Court (per the undersigned Magistrate Judge) authorized the public filing of a redacted response (and related materials).  (See Docket Entry 50.)  In addition, the Court (per the undersigned Magistrate Judge) accepted, as if timely filed, a declaration Defendant inadvertently had omitted when it responded.  (See Docket Entry 54.)

-3-

as a possible witness, because both declarations conflict with the testimony of Defendant's proper Rule 30(b)(6) witness(es), and because the declarations contain conclusory assertions as to legal issues. (See Docket Entry 53 at 8-11.) Defendant has sought leave to file a Surreply to address those arguments. (See Docket Entry 55.) Consideration of the Surreply (and/or of the declarations in question) does not alter the analysis of the critical summary judgment issues in this case (set out below) and, therefore, Defendant's instant Motion for Leave to File a Surreply to Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment (Docket Entry 55) will be granted.

### Applicable Legal Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering that question, the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, "unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006).

To the extent the Court must draw conclusions about matters of North Carolina contract law in evaluating Plaintiff's Motion for

Summary Judgment,[2] "the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940). However, "[a] state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." Id. Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ." Id. at 237. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id.

### The APA's Earnout Payment Provisions

Under the APA, Plaintiff agreed to convey certain assets to Defendant, including "the list of customers of [Plaintiff] who have received services provided by [Plaintiff] during the 2007 and 2008 calendar years, as set forth on Schedule 1.1(a) attached [to the

---

[2] The parties agree that North Carolina contract law applies in this case. (See Docket Entry 32 at 11-13, 16, 18-21; Docket Entry 51 at 17, 19-21.)

-5-

APA] (the 'Customer List')."  (Docket Entry 32-1 at 8 (underlining in original); see also Docket Entry 32-4 at 2-21, Docket Entry 33 at 2-21, Docket Entry 33-1 at 2-21, Docket Entry 33-2 at 2-4 ("Schedule 1.1(a)" containing the "Customer List").)[3]  The APA further documents Defendant's agreement to pay Plaintiff "an amount equal to the sum of (a) Thirteen Million Dollars ($13,000,000) (the 'Initial Purchase Price'), plus (b) the Earnout Amount (as defined in Section 2.3 [of the APA])."  (Id. at 10 (emphasis added).)

Section 2.3 of the APA establishes the following formula for calculating the Earnout Amount:

> (a) As used herein, (i) "First Earnout Period" shall mean the one (1) year period commencing on the first (1st) day of the calendar month immediately following the Closing and ending on the day immediately prior to the first (1st) anniversary of such commencement date; (ii) "Second Earnout Period" shall mean the one (1) year period commencing upon the day following the expiration of the First Earnout Period and ending on the day immediately prior to the first (1st) anniversary of such commencement date; (iii) "Revenue Minimum Target Amount" shall mean Four Million Nine Hundred One Thousand Two Hundred Fourteen Dollars ($4,901,214); (iv) "Revenue Multiplier" shall mean 2.1; (v) "Revenues" shall mean the revenues of [Defendant] for any and all services provided and billed to any customer listed on the **Customer List**, as reflected in financial statements of [Plaintiff] prepared in accordance with generally accepted accounting principles, consistently applied, and subject to the following:  (A) Revenues shall not include any revenues of [Defendant] as a result of the provision of services to Freedom Health, Inc. and (B) **if a customer included on the Customer List is a Shared Customer (as hereinafter**

---

[3] Plaintiff attached a copy of the APA (including incorporated exhibits and schedules) as part of Exhibit A to its Brief in Support of Plaintiff's Motion for Summary Judgment; the portions of said Exhibit A that encompass the APA appear in the record at Docket Entries 32-1, 32-2, 32-3, 32-4, 33, 33-1, and 33-2, as well as pages one through 38 of Docket Entry 33-3.  Defendant has not contested the authenticity of the APA copy in question, but instead has cited to said filing in opposing summary judgment. (See Docket Entry 51 at 5, 9, 10, 12, 13.)

-6-

**defined)**, then for purposes of determining the Earnout Amount, only a percentage of the revenues of [Defendant] for any and all services provided and billed to such Shared Customer shall be included in Revenues, such percentages corresponding to each Shared Customer being set forth on <u>Exhibit 2.3(a)</u> attached hereto; (vi) **"Shared Customers" shall refer to those customers listed on Exhibit 2.3(a), which include certain customers (other than Freedom Health Inc.) who were customers of both [Plaintiff] and [Defendant] during the period from January 1, 2007 through and including September 30, 2007**; (vii) "<u>First Earnout Period Revenues</u>" shall mean the Revenues of [Defendant] during the First Earnout Period, as determined pursuant to Section 2.3(d) below; (viii) "<u>Second Earnout Period Revenues</u>" shall mean the Revenues of [Defendant] during the Second Earnout Period, as determined pursuant to Section 2.3(d) below; and (ix) "<u>Earnout Amount</u>" shall mean the sum of the First Earnout Period Payment and the Second Earnout Period Payment, not to exceed Four Million Dollars ($4,000,000).

      (b) To the extent the First Earnout Period Revenues exceed the Revenue Minimum Target Amount, Seller shall be entitled to the payment of an amount equal to (i) the First Earnout Period Revenues <u>less</u> the Revenue Minimum Target Amount, <u>multiplied by</u> (ii) the Revenue Multiplier (the "<u>First Earnout Period Payment</u>"); <u>provided</u>, <u>however</u>, in no event shall the First Earnout Period Payment exceed Two Million Dollars ($2,000,000). For the avoidance of doubt, in the event the First Earnout Period Revenues do not exceed the Revenue Minimum Target Amount, the First Earnout Period Payment shall be zero (0).

      (c) To the extent the Second Earnout Period Revenues exceed the Revenue Minimum Target Amount, Seller shall be entitled to the payment of an amount equal to (i) the Second Earnout Period Revenues less the Revenue Minimum Target Amount, <u>multiplied by</u> (ii) the Revenue Multiplier, <u>less</u> (iii) the First Earnout Period Payment (the "<u>Second Earnout Period Payment</u>"); <u>provided</u>, <u>however</u>, in no event shall the First Earnout Period Payment and the Second Earnout Period Payment collectively exceed Four Million Dollars ($4,000,000). For the avoidance of doubt, in the event (A) the Second Earnout Period Revenues do not exceed the Revenue Minimum Target Amount or (B) the Second Earnout Period Payment is a negative number, the Second Earnout Period Payment shall be zero (0).

(Id. at 12 (underlining in original) (bolding added); see also Docket Entry 32-2 at 23-31, Docket Entry 32-3 at 2-7 ("Exhibit 2.3(a)" containing list of "Shared Customers").)

In moving for summary judgment, Plaintiff has asserted Defendant "admits that under the APA, as drafted and in the form agreed upon, the full Earnout [A]mount for both Earnout Periods is owed." (Docket Entry 32 at 7.) According to Plaintiff, Defendant's "sole defense to payment is that that [sic] the Shared Customer List was underinclusive . . . resulting in a 'mutual mistake.'" (Id. at 9.) In Plaintiff's view, Defendant "wants the Court to re-write the [APA] to include all the 'omitted' customers [as if listed on Exhibit 2.3(a) as Shared Customers], the effect of which would be to abrogate the Earnout [Payment] obligation entirely." (Id.; see also id. at 9 n.5 ("[Defendant] does not seek to void the APA for mistake; rather it wants to keep all the benefits it has received from the transaction but without the cost of the Earnout [Payment].").)

Defendant's summary judgment brief does indeed acknowledge that the provisions of the APA quoted and cited above would entitle Plaintiff to the total maximum Earnout Payment of $4,000,000 (see Docket Entry 51 at 2-3); however, as Plaintiff forecast, Defendant has opposed summary judgment on the ground that "the APA does not comport with the parties' intent as a result of a mutual mistake." (Id. at 2.) Specifically, Defendant asserts that "[a] failure by [Defendant] to initially correctly identify all customers shared between the parties on a 'shared customer list' means that, as

drafted, the APA gives Plaintiff a $4 million [Earnout Payment] based on revenues attributable to [Defendant's] own long-standing customers, . . . a result [that] was never intended by the parties . . . ." (Id. at 2-3.) According to Defendant, under these circumstances, North Carolina law permits reformation of the list of "Shared Customers" in Exhibit 2.3(a) of the APA to include additional customers (resulting in a reduction of relevant revenue calculations sufficient to negate Plaintiff's right to any Earnout Payment). (See id. at 17-20.)

Reformation for Mutual Mistake

Under North Carolina law, "[a] mutual mistake is one common to both parties to a contract wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement." Branch Banking & Trust Co. v. Chicago Title Ins. Co., ___ N.C. App. ___, ___, 714 S.E.2d 514, 518 (2011) (internal ellipses and quotation marks omitted). "Reformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake . . . the written instrument fails to embody the parties' actual, original agreement." Id. at ___, 714 S.E.2d at 517-18 (internal quotation marks omitted). As the "party seek[ing] to reform a contract due to an affirmative defense such as mutual mistake," Defendant bears "the burden of proof," id. at ___, 714 S.E.2d at 518 (internal ellipses and quotation marks omitted).

More specifically, Defendant "has the burden of showing that the terms of the instrument do not represent the original understanding of the parties and must do so <u>by clear, cogent and convincing evidence</u>." <u>Hice v. Hi-Mil, Inc.</u>, 301 N.C. 647, 651, 273 S.E.2d 268, 270 (1981) (emphasis added). "Additionally, there is a <u>strong presumption</u> in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety." <u>Id.</u> (internal quotation marks omitted) (emphasis added). Given this "strong presumption," <u>id.</u>, at the summary judgment stage, Defendant must identify record evidence from which a reasonable fact-finder could render judgment, "by clear, cogent and convincing evidence," <u>id.</u>, as to: "'(1) the terms of an oral agreement made between the parties; (2) their subsequent adoption of a written instrument intended by both to incorporate the terms of the oral agreement but differing materially from it; and (3) their mutual but mistaken belief that the writing contained their true, i.e., the oral, agreement,'" <u>Branch Banking</u>, ___ N.C. App. at ___, 714 S.E.2d at 518 (quoting <u>Matthews v. Van Lines</u>, 264 N.C. 722, 725, 142 S.E.2d 665, 668 (1965)); <u>see also</u> <u>Dorsey v. Dorsey</u>, 306 N.C. 545, 547, 293 S.E.2d 777, 779 (1982) ("All the essential elements for reformation must be proved by clear, strong, and convincing evidence.").

The record in this case does not contain evidence sufficient to support a finding that, prior to the execution of the APA, the parties reached an oral agreement that differs materially from the

-10-

APA because of a mutual mistake in the drafting of the APA. In particular, to prevail in this case, Defendant must identify record evidence from which a reasonable fact-finder could conclude that, before they executed the APA, the parties orally agreed that the customers Defendant now contends should have appeared on the APA's Exhibit 2.3(a), in fact would constitute "Shared Customers," i.e., customers as to whose future revenues Plaintiff would get only reduced credit in determining Plaintiff's eligibility for an Earnout Payment. Defendant, however, has not pointed to any evidence that, prior to the APA's execution, the parties ever agreed to any list of "Shared Customers" other than the one in the APA's Exhibit 2.3(a) or ever agreed to any discrete, objective criteria that would make a particular customer a "Shared Customer" for purposes of calculating revenues relevant to the Earnout Payment. (See Docket Entry 51 at 12-16, 18 (containing Defendant's discussion of and citations to allegedly relevant record material regarding "Shared Customer Carve Out," "Errors in the Shared Customer List," and "presence of a mutual mistake").)

To the contrary, Defendant has acknowledged that, during the drafting process that resulted in the APA (and its Exhibit 2.3(a) listing "Shared Customers"), Defendant "agreed to remove customers from [Defendant's proposed] Shared Customer List at [Plaintiff's] request based on [Plaintiff's] position that although a given customer was technically 'shared' — *i.e.*, serviced by both [Defendant] and [Plaintiff] during the agreed to January 1 to September 30, 2007 period — the customer was currently being

-11-

serviced exclusively by [Plaintiff] and thus was in reality being brought to [Defendant] through the acquisition." (Id. at 14 (italics in original).) Defendant has not come forward with any evidence that, prior to the execution of the APA (with its Exhibit 2.3(a) listing "Shared Customers"), Plaintiff orally agreed that the other customers Defendant now contends should have appeared in Exhibit 2.3(a) in fact should constitute "Shared Customers" for purposes of Earnout Payment calculations. (See id. at 12-16, 18.)[4]

In essence, Defendant seeks reformation based on the prospect that a fact-finder might conclude that Plaintiff would have accepted an Exhibit 2.3(a) to the APA that included on the list of "Shared Customers" the additional customers now belatedly identified by Defendant. Such an approach does not fit within the scope of the mutual mistake doctrine recognized by North Carolina

---

[4] Moreover, Defendant's summary judgment brief does not dispute Plaintiff's assertion (see Docket Entry 32 at 4-5) that — as part of the negotiation process — Plaintiff gave Defendant Plaintiff's list of customers, but Plaintiff lacked any access to Defendant's list of customers. (See Docket Entry 51 at 2-21.) Plaintiff thus had no information from which to accept (or to challenge) the placement of customers on any "Shared Customer" list apart from the specific proposed lists tendered to it by Defendant after Defendant compared Plaintiff's list of customers to Defendant's own records. (See Docket Entry 32 at 4-5.) Further, assuming (as Defendant contends) the record reflects that Plaintiff's transactional attorney acknowledged holding an expectation during the negotiation process "that both [Defendant] and [Plaintiff] would provide accurate information to arrive at the Shared Customer List" (Docket Entry 51 at 14), such evidence does not support an inference that, prior to the execution of the APA, Plaintiff orally agreed that the customers Defendant now seeks to have added to Exhibit 2.3(a) of the APA would constitute "Shared Customers" for purposes of determining Plaintiff's eligibility for an Earnout Payment. The record simply does not reflect what agreement the parties would have reached about the composition of Exhibit 2.3(a) had Defendant provided "accurate" information about the customers in question. Finally, for reasons discussed below, under North Carolina law, reformation based on mutual mistake requires the comparison of a written agreement to a prior oral agreement actually made by the parties, not to a hypothetical oral agreement the parties might have made.

-12-

law, as the following statement from the North Carolina Court of Appeals illustrates:

> Chicago Title needed to show that it and BB&T had a <u>meeting of the minds as to the specific terms</u> of the 2003 policy, and that some material part of their agreement was mistakenly omitted from the 2003 policy. In the present case, Chicago Title and BB&T <u>needed to have orally agreed upon the specific description</u> of the real property to be covered by the 2003 policy. <u>A general intent</u> on the part of Chicago Title to cover whatever real property BB&T intended to have covered <u>is insufficient to form the basis for a reformation based upon mutual mistake</u>. Chicago Title fails to make any argument that it and BB&T had <u>specifically agreed</u> that the contested parcel would be excluded from coverage by the 2003 policy. . . .
>
> Viewing the evidence in the light most favorable to the party opposing summary judgment, Chicago Title simply has not provided a factual basis to support equitable reformation of the 2003 policy. <u>Chicago Title did not present evidence sufficient to forecast a showing that BB&T and Chicago Title had mutual intentions</u> to exclude the Centura deed of trust from the 2003 policy and that the 2003 policy, as the result of a mutual mistake, failed to properly express those intentions.

<u>Branch Banking</u>, ___ N.C. App. at ___, 714 S.E.2d at 519 (internal brackets, citations, and quotation marks omitted) (emphasis added).

Under the foregoing standard, to secure reformation based on its mutual mistake defense, Defendant "needed to show that it and [Plaintiff] had a <u>meeting of the minds as to the specific terms</u> of the [asset purchase], and that some material part of their agreement was mistakenly omitted from the [APA]," <u>id.</u> (emphasis added). More precisely, Defendant had to come forward with evidence that the parties "orally agreed upon the <u>specific description</u> of the ['Shared Customers'] to be covered by the [agreement]," <u>id.</u> (emphasis added). The record, however, lacks any

-13-

evidence that the parties reached "a meeting of the minds as to the specific terms of the [asset purchase]," id., other than that reflected by the APA.  Nor does the record reflect that the parties "orally agreed upon the specific description of the ['Shared Customers'] to be covered by the [agreement]," id., other than the description contained in Exhibit 2.3(a) of the APA.

"A <u>general intent</u> on the part of [Defendant regarding the terms of the agreement] . . . is insufficient to form the basis for a reformation based upon mutual mistake."  Id. (emphasis added). Defendant's claim for reformation thus lacks merit because Defendant "fail[ed] to make any argument that it and [Plaintiff] had <u>specifically agreed</u>," id. (emphasis added), that the customers in question would appear in Exhibit 2.3(a) of the APA.  "Viewing the evidence in the light most favorable to [Defendant], [it] simply has not provided a factual basis to support equitable reformation of the [APA].  [Defendant] did not present evidence sufficient to forecast a showing that [it and Plaintiff] had <u>mutual</u> intentions to [include the customers in question on the list of 'Shared Customers'] and that [Exhibit 2.3(a) of the APA], as the result of a mutual mistake, failed to properly express those intentions."  Id. (emphasis added).[5]

---

[5] The foregoing discussion demonstrates that Defendant's focus on evidence regarding its general intent to come up with a formula for the Earnout Payment conditioned on growth of revenues due to the acquisition and Plaintiff's supposed acceptance of this premise (see Docket Entry 51 at 8-13, 18) is misplaced.  To secure reformation based on mutual mistake, Defendant has an obligation to identify evidence of an oral agreement about a specific contractual term, i.e., what customers would constitute "Shared Customers" for purposes of determining
(continued...)

In sum, on the record of this case, the lone affirmative defense on which Defendant now relies (to avoid its obligation to tender to Plaintiff the maximum Earnout Payment required by the APA) fails as a matter of law. As a result, the Court should enter summary judgment in Plaintiff's favor.

CONCLUSION

Even after consideration of Defendant's Surreply (and the declarations discussed therein), the Court should conclude that Defendant's argument for reformation based on mutual mistake lacks sufficient evidentiary support to survive summary judgment. The written terms of the APA thus govern and Defendant has acknowledged that, under those written terms, Plaintiff has a right to the maximum Earnout Payment. Accordingly, Plaintiff has shown that "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

**IT IS THEREFORE ORDERED** that Defendant's Motion for Leave to File a Surreply to Plaintiff's Reply Brief in Further Support of its Motion for Summary Judgment (Docket Entry 55) is **GRANTED.**

**IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Docket Entry 31) be **GRANTED.**

                                               /s/ L. Patrick Auld
                                                     **L. Patrick Auld**
                                      **United States Magistrate Judge**
November 28, 2011

---

[5](...continued)
the Earnout Payment, that differed from Exhibit 2.3(a) of the APA. Evidence about the general principles that may have informed the parties' negotiations over the Earnout Payment formula does not suffice.